## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **AMY HEBERT** | **CIVIL ACTION** |
| **VERSUS** | **NO.  15-4950** |
| **JIM ROGERS, WARDEN, C.A.** | **SECTION "I" (5)** |

## <u>REPORT AND RECOMMENDATION</u>

On August 20, 2007, Amy Hebert awoke in the night and killed her two children and the family dog.  Thereafter, on September 26, 2007, Hebert was indicted in  Lafourche Parish on two counts of first-degree murder, for which the State sought the death penalty.[1] Hebert's jury trial began on April 16, 2009, and lasted until May 14, 2009, when the jury found her guilty as charged on both counts.[2]  During the penalty phase of the trial, the jury was unable to reach a unanimous sentencing verdict.  Consequently, the trial court sentenced Hebert to two consecutive terms of life in prison.[3]  She is currently incarcerated in the Louisiana Correctional Institute for Women.[4]

## I.    PROCEDURAL HISTORY

Following her conviction, Hebert filed a direct appeal in the Louisiana First Circuit

---

[1] State Rec. Vol. 1 of 45.
[2] State Rec. Vol. 20 of 45.
[3] State Rec. Vol. 28 of 45; May 16 transcript Vol. 2, p. 30.
[4] State Rec. Vol. 23-42.

Court of Appeal, in which she raised six claims: (1) the trial court erred when it denied her post-verdict motion for a judgment of acquittal; (2) the trial court erred when it denied her motion for a new trial; (3) there was insufficient evidence to support her conviction; (4) the trial court erred when it limited Dr. Spitz' testimony; (5) the trial court erred when it denied Hebert's motion for a change of venue and (6) the trial court imposed an excessive sentence by making the life sentences consecutive.[5]  The First Circuit denied her appeal in an unpublished opinion on February 11, 2011.[6]  Hebert filed a writ application to the Louisiana Supreme Court, which was denied without opinion on October 21, 2011.[7] Hebert's conviction became final 90 days later, on Thursday, January 19, 2012, when she did not file a writ application in the United States Supreme Court.[8]

On January 16, 2013, Hebert timely filed an application for post-conviction relief in the state district court.  Her petition raised five claims: (1) trial counsel was ineffective for failing to make a *J.E.B./Batson* objection to the State's use of its peremptory challenges; (2) Hebert's rights to confrontation, an impartial jury, and a fair trial were violated when one of the jurors – a nurse – introduced her own, extraneous, medical expertise into jury deliberations; (3) the jury engaged in premature deliberations, violating Hebert's due-process rights; (4) Hebert's trial lawyers were ineffective for disclosing investigative work-product, thereby violating Hebert's privilege against self-incrimination and (5) appellate counsel was ineffective for failing to challenge the warrantless search of Hebert's home.

---

[5] State Rec. Vol. 43 of 45; *State v. Hebert*, No. 2010-KA-0305, 57 So.3d 608 (La. App. 1st Cir. 2011), (Table), 2011 WL 2119755 .

[6] *Id.*

[7] *State v. Hebert*, 73 So.3d 380 (La. 2011), No. 2011-K-0864.

[8] *See Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003) (*citing* 28 U.S.C. § 2244(d)(1)(a)).

*Id*.[9]

The trial court ordered the State to file an answer to Hebert's application. On February 4, 2013, the State filed a "Motion to Strike Pleadings and Exhibits" for claims 2 and 3 (the jury-misconduct claims).[10] On April 8, 2013, a hearing was held on the State's motion to strike and the trial court granted that motion.[11] Following the trial court's ruling, Hebert sought supervisory writs in the Louisiana First Circuit Court of Appeal and the Louisiana Supreme Court challenging the trial court's ruling striking claims 2 and 3; on July 29, 2013, the First Circuit Court of Appeal denied Hebert's writ and, on May 30, 2014, the Louisiana Supreme Court followed suit.[12]

On June 20, 2014, the trial court ordered the State to answer Hebert's three remaining post-conviction claims by July 21, 2014. In the interim, on June 23, 2014, Hebert filed a "Supplement to Application for Post–Conviction Relief and Motion for Evidentiary Hearing," which the trial court granted.[13] In this supplemental post-conviction application, Hebert raised only one additional issue: "Trial counsel's failure to follow up on information that petitioner had a long-standing but untreated seizure disorder that likely caused her psychotic break constituted ineffective assistance of counsel, as this evidence was essential to a meaningful presentation of petitioner's insanity defense."[14] In response, on July 23, 2014, the State filed procedural objections to Hebert's supplemental application.[15] On

---

[9] The procedural history of Hebert's post-conviction relief application is largely taken from the trial court's written decision denying Hebert's post-conviction application, which the Louisiana Supreme Court attached to its opinion. *State v. Hebert*, 182 So. 3d 23, 24 (La. 2015), Case No. 2015-0965; State Rec. Vol. 43 of 45.
[10] *Id.*
[11] State Rec. Vol. 44 of 45.
[12] *Id.*; *State v. Hebert*, 140 So. 3d 734 (La. 2014), Case No. 2013-KP-2065.
[13] *Hebert*, 182 So. 3d 23 (La. 2015).
[14] *Id.* at 24.
[15] *Id.*

August 14, 2014, the court denied the State's objections and again ordered the State to answer Hebert's post-conviction application.[16]  The State filed its answer to Hebert's four outstanding claims on September 12, 2014.[17]

On December 29, 2014, the trial court issued a written opinion denying Hebert's four remaining claims.[18]  Hebert then sought a writ of review from the Louisiana First Circuit Court of Appeal, which that court denied on April 20, 2015 without written opinion.[19]  Finally, on October 2, 2015, in the last reasoned state-court opinion, the Louisiana Supreme Court denied all of Hebert's post-conviction claims.[20]  In that opinion, the Louisiana Supreme Court briefly addressed Hebert's claims of ineffective assistance of counsel and "attached[ed] and incorporate[d] the trial court's written opinion denying her post-conviction application."[21]

The record reflects that on October 2, 2015, Hebert filed her petition for federal *habeas corpus*.[22]  That petition was referred to this Court to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.[23]

In her petition, Hebert alleges six grounds for relief:[24]  (1) there was insufficient

---

[16] *Id.*
[17] *Id.*
[18] State Rec. Vol. 45.
[19] Rec. Doc. No. 1, Exh. 17; 2015-KW-0289.
[20] *Hebert*, 182 So. 3d 23 (La. 2015).
[21] *Id.*
[22] Rec. Doc. No. 1.  The state court record accompanying her petition consists of 45 volumes.
[23] Upon review of the petition, this Court has determined that a federal evidentiary hearing is unnecessary at this time. See 28 U.S.C. § 2254(e)(2).
[24] The Court addresses these issues somewhat out of the order in which they were raised by Petitioner for ease of analysis.

evidence to rebut her insanity defense; (2) the State unlawfully struck qualified prospective female jurors on the basis of their gender and counsel was ineffective for failing to raise challenges to those improper strikes; (3) trial counsel was ineffective for failing to follow-up on Hebert's seizure disorder; (4) appellate counsel was ineffective for failing to challenge the search of Hebert's home; (5) Hebert was denied her rights of confrontation, jury impartiality and a fair trial because the jury considered extraneous information; and  (6) Hebert was denied due process and a fair trial because of premature juror deliberation.[25]  On November 5, 2015, the State responded.  The State concedes that Hebert's petition was both exhausted and timely filed.[26]  The State challenges all of the claims on the merits, but also argues that claims five and six were decided on independent and adequate state grounds and are thus procedurally defaulted.[27]

For the reasons that follow, this Court recommends that Hebert's petition for *habeas corpus* relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

## II.    THE FACTS OF THE UNDERLYING CASE

There is no dispute that on August 20, 2007, Hebert awoke in the middle of the night, gathered multiple knives, and killed her two children, Braxton and Camille, along with the family dog.[28]  The Louisiana First Circuit Court of Appeals described the grisly details of how each child was killed:

> Braxton suffered approximately 20–25 stab wounds to his chest and approximately 50–55 stab wounds to his back.  The number of wounds could not be determined exactly due to the presence of perforating wounds, i.e., wounds that went entirely through his body and exited on the other side.  He

---

[25] *Id.*
[26] Rec. Doc. No. 8, p. 2, 5.
[27] *Id.* at 25.
[28] Rec. Doc. No. 1, p. 7; State Rec. Vol. 43 of 45; *Hebert*, No. 2010-KA-0305 (La. App. 1st Cir. 2011), 2011 WL 2119755, at *1-2.

also suffered five defensive wounds on his left arm and one or two defensive wounds on his right arm. Braxton bled to death.

Camille suffered approximately 30–35 stab wounds to her chest and approximately 30–35 stab wounds to her back. She also suffered perforating wounds. She had five defensive wounds on her left arm and nine defensive wounds on her right arm. She was stabbed in the scalp approximately 30 times. Camille also bled to death.

*Id.* Hebert did not stab only her children – she also stabbed herself repeatedly, slashed her wrists to the point that her tendons were exposed, punctured her lungs until they collapsed, and cut her chest, skull, neck, legs and eyelids. *Id.*

It wasn't until the next morning that the resulting carnage was discovered:

The children's paternal grandparents, R.J. "Buck" and Judy Hebert … became concerned for the welfare of the defendant and [their] grandchildren. [Buck Hebert] knocked on the defendant's front door, and when no one answered, he broke into the utility room of the home by climbing through a window. Buck saw blood splattered on the floor of the kitchen/dining area. In the master bedroom, he saw a large quantity of blood and the defendant lying in bed with the [dead] children. Buck tried to exit the house to summon help, but the doors had been dead-bolted from the inside, and he could not find the keys.

Upon arrival, the police broke the kitchen door down and entered the house. When the police entered the master bedroom, the defendant lifted a large knife in her right hand and shouted, "Get the f––– out." The police used a Taser electroshock weapon to force the defendant to drop her knife so that they could attempt a rescue of the children. After removing the children from the bed, the police discovered multiple knives in the bed, as well as a dead dog.

*Id.*

At the crime scene, the police found two blood-stained notes. The first note was addressed to Hebert's ex-husband, Chad Hebert:

Chad,
You wanted your own life. You got it. I'll be damned if you get the kids, too.
Your ambition & greed for money won out over your love for your family.
The hell you put us through & I do mean all of us because you don't know what the kids used to go through because of course you weren't here.
This is no kind of life for them to live.

I sure hope you two lying alduttering [sic] home wrecking whores can have more kids because you can't have these.

Actually I hope you can't because then you'll only produce more lying homewrecking adultering [sic] whores like yourselves.

Maybe you can buy some with all of your money you will make from this house & the life insurance benefits you'll get from the kids.

*Id.* at 2.  The second note was addressed to Hebert's mother-in-law, Judy Hebert:

Judy,

You run from the very thing you support!

Monica pairs up with a married man, becomes a kept woman & your response is maybe she is in love with him—so that makes it okay?  How stupid!  Your sons have affairs bring these whores home & you welcome them all in. I guess its okay for them to hurt the family as long as it is not you.

Well when you started delivering my kids to that whore, Kimberly, that was the last straw!

To all my friends thanks for all the help & support you tried to give me.

I love you all,

Sorry Daddy, Celeste & Renee I love you all too.

*Id.*

### III.    THE TRIAL

During its case in chief at trial, the defense called four expert witnesses: Dr. Alexandra Phillips, Dr. Phillip Resnick, Dr. Glenn Ahava, and Dr. David Self.  The Louisiana First Circuit summarized their testimony as follows:

Defense witness Dr. Alexandra Phillips testified as both a fact witness and as a court-accepted expert in psychiatry.  Dr. Phillips was the attending physician for the acute psychiatric unit when the defendant was brought to the hospital. She attempted to talk with the defendant on August 21, 2007, the day after the offense, but the defendant was unresponsive.  Dr. Phillips again met with the defendant on August 23, 2007.  The nurses were concerned because the defendant was not eating; the defendant told Dr. Phillips she was not eating because she was afraid of getting sick and vomiting.  The defendant advised Dr. Phillips that she had heard the words of Satan for a long time and had pushed them away with the words of Christ and prayer.  The defendant said she had not been planning on killing herself, but Satan took over, and she snapped.  Dr. Phillips asked the defendant if she was hearing the voice of Satan at that moment, and the defendant stated Satan was in the room laughing at her.  Dr. Phillips observed the defendant's eyes tracking the room.  Dr. Phillips's attempts to redirect or calm the defendant were unsuccessful, and

the defendant began to scream.  Dr. Phillips concluded the defendant was completely psychotic and responding to internal stimuli so anti-psychotic medication was prescribed.

The court accepted defense witness Dr. Phillip Resnick as an expert in psychiatry. Dr. Resnick examined the defendant on August 6, 2008.  The defendant told Dr. Resnick that in the summer of 2007 she was depressed, had lost weight, and did not have a good appetite.  She was having trouble sleeping and lost interest in things. She felt fatigued and worthless.  The defendant indicated she had trouble concentrating and remembering things and had thoughts of suicide.

Dr. Resnick defined "psychosis" as being out of touch with reality. In his opinion, on the day of the offenses, the defendant suffered an auditory hallucination. The defendant said she heard a forceful male voice telling her that her ex-husband was going to take away her children, that she had to keep the family together, and that the family had to die to stay together.  The defendant told Dr. Resnick that the voice instructed her to stab her children and to kill herself, and after she killed the victims, the voice dictated the notes she left at the scene.  Dr. Resnick noted the defendant told Dr. Phillips that she heard Satan laughing at her.  According to Dr. Resnick, the defendant was having auditory hallucinations when she heard the voice of Satan.  Dr. Resnick maintained it was not surprising that the defendant's hallucination at the time of the offenses reflected her concerns that her children were getting close to her ex-husband's fiancée, that he was building a new house, and that she might lose custody of them.  The defendant advised Dr. Resnick that when she stabbed Camille, Camille said, "Mommy, I love you. I don't want to die," and the defendant told her, "I love you, but I don't want daddy to take you away."

Dr. Resnick concluded that on the day of the offenses the defendant was suffering from major depression and killed her children because she was psychotic.  In his opinion, with reasonable medical certainty, due to severe psychotic depression, distorted mind, delusions, and hallucinations, the defendant could not distinguish whether stabbing her children was right or wrong because she believed it was in their best interests.  He conceded, however, that he had seen no evidence the defendant had been diagnosed as psychotic prior to the offenses, including when she saw a neurosurgeon and physical therapists in August 2007.  He also conceded that Dr. Phillips's conclusion that the defendant was suffering from psychosis beginning long before Dr. Phillips saw her was unsupported by the evidence.

The defense also presented testimony at trial from Dr. Glenn Wolfner Ahava, who was accepted by the court as an expert in forensic psychology.  He became involved in the case in January of 2008 and interviewed the defendant four times between March 28, 2008, and August 11, 2008.  Dr. Ahava did not think the defendant was malingering.  He diagnosed the defendant as suffering from

major depressive disorder that was severe, recurrent, and with psychotic features. In his opinion, on the day of the offenses, it was more likely than not that the defendant could not distinguish right from wrong with respect to her criminal conduct. The defendant, a religious woman, had a delusional belief consistent with depression that God was speaking to her and commanding her. According to the defendant, on the day of the offenses, God spoke to her and told her "he" was going to take the children away, and she had to kill the children and herself to keep the family together so that they could go to heaven. The defendant advised Dr. Ahava that the voice told her to stab the victims in the head. The defendant told Dr. Ahava that as she stabbed the victims, she told them she loved them, but she could not let their father take them. The defendant explained that the voice told her to kill the family dog and, then, to make coffee to stay awake to write the notes. The defendant told Dr. Ahava she hesitated twice before stabbing the victims, but the voice told her to practice on a bed.

Dr. Ahava testified that the defendant, who was forty-one years old when he saw her, reported a history of mental health issues dating back to her early twenties. He conceded, however, there were no medical records to support her claim. The defendant told him she had heard voices prior to the date of the offenses; however, she had not made that claim to any of the other doctors who had interviewed her. According to Dr. Ahava, the number of stab wounds inflicted on the victims indicated the defendant was obviously psychotic.

Dr. David Self testified as an expert in forensic psychiatry. Dr. Self interviewed the defendant on July 16, 2008, and August 14, 2008. He diagnosed her as suffering from major depression that was recurrent and severe with psychosis. He indicated with reasonable psychiatric certainty that due to mental disease the defendant was incapable of distinguishing the wrongfulness of her conduct in killing the victims. The defendant advised Dr. Self that she suffered from symptoms of major depression following the birth of Braxton, and her depression became much worse when her husband announced his intent to separate from her. Dr. Self testified that the likelihood of a person suffering from mental illness increased if other family members suffered from mental illness. The defendant's sister had a psychotic breakdown in her teens; the defendant's uncle had been diagnosed with schizophrenia; and the defendant's maternal grandfather had committed suicide. The defendant told Dr. Self that on the day of the offenses she heard a male voice taunting her, "He's going to take the children. He's going to take them." According to the defendant, the voice told her she had to keep the family together by killing the children and then herself, and to stab the brains of the children. Dr. Self, reflecting on the defendant's self-inflicted wounds, stated that only the most psychotic people attack their own eyes.

*Id*. at 3-5.

In rebuttal, the State called two expert witnesses, Dr. Rafael Salcedo and Dr. George Seiden, who testified that Hebert was not psychotic when she killed her children, but instead committed the killings as an act of "retribution." The First Circuit summarized Drs. Salcedo and Seiden's testimony:

> The State presented testimony at trial from Dr. Rafael Salcedo, a court accepted expert in clinical and forensic psychology. He interviewed the defendant on April 28, 2008. In Dr. Salcedo's opinion and within a reasonable degree of psychological certainty, at the time of the offenses, although the defendant was suffering from a psychotic disorder (major depression), the disorder did not rise to the level that it impaired her ability to distinguish right from wrong. Stated differently, the defendant was capable of distinguishing right from wrong when she murdered her children.
>
> Dr. Salcedo delineated numerous sources of stress in the defendant's life from 2006 until the date of the offenses. The defendant's husband, Chad, had moved out and ultimately divorced her. The defendant did not want the divorce. The defendant was a single mom, and Braxton suffered from Asperger's disorder, a mild form of autism. The defendant was very angry with her ex-husband and that anger intensified when she learned that he was involved with Kimberly. Moreover, the children were excited that Chad and Kimberly were building a house. Camille was becoming attached to Kimberly; the defendant had seen Camille at a ball game holding hands with, or sitting next to, Kimberly. Camille was excited about being a flower girl at Chad and Kimberly's wedding. The defendant also was upset by Chad's mother, Judy, encouraging a relationship between Braxton, Camille, and Kimberly.
>
> Dr. Salcedo testified that psychosis builds up over time. A delusion that lasts four hours—beginning suddenly without any evidence of delusional thinking and ending after being shocked by a Taser—would be very unusual. Dr. Salcedo pointed out that the defendant first claimed she was acting at the direction of God and later at the direction of Satan. Moreover, the defendant's note to Chad did not appear to be written by someone who was psychotic. Dr. Salcedo explained:
>
>> "It is logical. The content is consistent with the circumstances that were found to be in evidence later on. It shows no evidence of loosening of associations. See, one of the things that I didn't mention is that psychosis is not just hallucinations and so called delusions. Usually, a psychotic individual also displays disorganized thinking, loosening of associations, you know, they go off on tangents. You ask them one question, they come back with something else. You

> know, it incorporates what we call cognitive distortions, cognitive disorders. That's a very well-written, well-organized, thought-out letter."

Dr. Salcedo stated the defendant's statement in the note, "You wanted your own life. You got it. I'll be damned if you get the kids, too," presented a plausible motive for the behavior she manifested. When the defendant wrote, "I sure hope you two lying alduttering (sic) home wrecking whores can have more kids because you can't have these," she was telling Chad that she was getting ready to kill, or had already killed, the children, and he was not going to have them. Dr. Salcedo also remarked the note showed no evidence of delusional ideation; specifically, the note did not refer to heaven or being together.

Dr. Salcedo also discussed the defendant's note to her ex-mother-inlaw (sic), Judy. The defendant's statement, "Well when you started delivering my kids to that whore, Kimberly, that was the last straw!" was consistent with Judy supporting Kimberly developing a close relationship with Camille and Braxton. The defendant had a huge amount of anger at her mother-in-law and had not let Camille and Braxton visit Judy's house, which was across the street from her own house, since June of 2007. Dr. Salcedo concluded his analysis of the notes by stating:

> "Well, what you have here is something that I've never had in the numerous not guilty by reason of insanity cases that I've been involved with and, that is, you have an authored description written by the defendant of her mental state at the time. Sometimes you have observers. Sometimes you have a video camera. Sometimes you have witnesses. But rarely are you able to get inside the mind of the defendant in such close proximity to the time of the commission of the alleged offense. It's almost like having a videotape of her thought processes at the time. That's what's remarkable about this case.

> And I would add that there's no mention of psychosis or delusions or, you know, nothing psychotic in the notes themselves, as opposed to what she self-reported."

Dr. Salcedo indicated in a retribution killing of children, also known as a spousal revenge killing of children, the woman who kills her children loves them but that love is overridden by her hatred for her spouse. It is typical in such a killing to leave behind a note to inflict cruelty on the other spouse.

Dr. Salcedo testified that people who are depressed often commit suicide. A suicidal mother may be very concerned about what will happen to her children

after the parent kills herself and, therefore, may decide to kill the children too. Given the defendant's religious belief that heaven was a better place—which he noted was not a delusion but, rather, a belief shared by many people from her church—and her anger toward Chad, she decided to kill her children and herself.

In Dr. Salcedo's opinion, Dr. Phillips did not have enough information to render an accurate diagnosis. Dr. Phillips's final diagnosis of the defendant was "psychosis NOS," which means "not otherwise specified," or the diagnosis does not fit in any category of psychosis. Dr. Salcedo opined that Dr. Phillips did not have any background information on the defendant and assumed the defendant was crazy because she talked about Satan and God and seemed to be hyper-religious.

State witness Dr. George Seiden was accepted by the court as an expert in general and forensic psychiatry. He interviewed the defendant on March 24, 2009. Dr. Seiden stated that, although the defendant was suffering from a depressive episode, on the day of the offenses, she was capable of distinguishing right from wrong in connection with the killings of the victims.

Dr. Seiden found no evidence in the defendant's medical records that she had exhibited any psychotic features prior to the day of the offenses. He pointed out that on August 16, 2007, on a "Functional Health Intake Summary" for a physical therapist, the defendant indicated she could fully concentrate.

The defendant told Dr. Seiden that a voice had commanded her to kill her children. She also told him she attempted to stab one of the children, left, and then came back. The defendant explained she hesitated because she "could not hurt her babies." According to Dr. Seiden, the defendant's statement indicated she knew she was going to hurt her children.

Dr. Seiden found nothing in the defendant's note to Chad that indicated she was in a psychotic state when it was written. He found no evidence of the psychotic disorganization of thought that is seen in a true psychosis. To the contrary, Dr. Seiden felt the note indicated the defendant was not psychotic at the time it was written. The defendant's statement in her note, "Sorry Daddy, Celeste & Renee I love you all too," was significant in that it was a statement acknowledging she had done something wrong. Dr. Seiden defined a delusion as a fixed false belief that cannot be changed with any amount of information and that is not consistent with the culture. Herein, there was no delusion but, rather, the defendant's fear of losing her children either through formal legal means or through the loss of their love.

In thirty years of practice, Dr. Seiden had never seen or read about a psychotic disorder that began and ended suddenly. Psychoses gradually develop and gradually ebb. Dr. Seiden concluded that Dr. Phillips was mistaken in her

diagnosis of the defendant on August 23, 2007, because Dr. Phillips did not view the defendant's claim of Satan being in the room and laughing at her within the context of the defendant's religious beliefs—that Satan is a real and tangible entity.

*Id*. at 5-8.

## IV.   GENERAL STANDARDS OF REVIEW APPLICABLE TO HEBERT'S *HABEAS* PETITION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law, and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  *Bell*, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

*Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014).  However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; *it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.  Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.*  AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

*Id.* (citations and quotation marks omitted) (emphasis added).

Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent does not warrant *habeas* relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that *habeas corpus* is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (citations omitted) (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal

courts – from using federal *habeas corpus* review as a vehicle to second-guess the reasonable decisions of state courts").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. *White*, 134 S. Ct. at 1701.

## V.    ANALYSIS OF HEBERT'S SPECIFIC CLAIMS

### A.   *Sufficiency of the Evidence*

Hebert's first claim is that no rational juror could have found her guilty because she proved by a preponderance of the evidence that she was legally insane at the time she committed the murders.[29]   In response, the State argues that its two expert witnesses provided sufficient evidence that Hebert deliberately sought "retribution" against her ex-husband and was not psychotic when she killed her children.   On direct appeal, both the Louisiana First Court of Appeal and the Louisiana Supreme Court denied this sufficiency-of-the-evidence claim.[30]

A claim of insufficiency of the evidence is a mixed question of law and fact, requiring this Court to examine whether the state court's denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent. *Penry v. Johnson*, 215 F.3d 504, 507 (5th Cir. 2000); *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995). As noted below, the state appellate court invoked the correct standard in Hebert's direct appeal,[31] which means this Court is left to determine whether that court's *application* of that standard

---

[29] Rec. Doc. No. 1.
[30] *Hebert*, 57 So.3d 608; *Hebert*, 73 So.3d 380.
[31] *Hebert*, 2010-0305 (La. App. 1st Cir. 2/11/11)

was objectively unreasonable.  For the reasons set forth below, this Court recommends that Hebert's sufficiency claim be denied.

### 1.    Standard of Review

The Supreme Court established the due-process standard that a reviewing court must employ in analyzing the sufficiency of the evidence in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  Under *Jackson*, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime, as identified by state substantive law, to have been proven beyond a reasonable doubt.  *Id.* at 316–17, 99 S.Ct. at 2787.  In this case, Hebert claims that no rational jury could have concluded that she failed to prove she was legally insane at the time she committed the murders.

In Louisiana, a criminal defendant is presumed to be sane and responsible for his or her actions.  La.Rev.Stat. § 15:432; *State v. Peters*, 643 So.2d 1222, 1225 (La. 1994).  However a defendant may rebut this presumption by a preponderance of evidence.  La.Rev.Stat. § 15:652; *see State v. Silman*, 663 So.2d 27, 32 (La. 1995).  Notably, the State is not required to offer any proof of the defendant's sanity or to offer evidence to rebut the defendant's evidence.  *State v. Thames*, 95–2105 (La. App. 1 Cir. 9/27/96); 681 So.2d 480, 486, *writ denied*, 96–2563 (La.3/21/97); 691 So.2d 80.  "Legal insanity is proved if the circumstances indicate that a mental disease or mental defect rendered the offender incapable of distinguishing between right and wrong with reference to the conduct in question."  *Peters*, 643 So.2d at 1225 (citing La.Rev.Stat. § 14:14).

Here there is no question that Hebert actually committed the acts for which she was charged – first-degree murder.  Instead of making a typical sufficiency argument, however,

*i.e.*, the prosecution failed to meet one of its essential elements, Hebert makes the argument that she overcame the presumption that she was sane so that no rational jury could have found her guilty.  In light of Louisiana law on the issue of insanity, the inquiry under *Jackson* is whether viewing the evidence in the light most favorable to the State, any rational trier of fact could have found that Hebert had not proven by a preponderance of the evidence that she was insane at the time of the offense.  *See Thames*, 681 So. 2d at 486, *see also Donahue v. Cain*, 231 F.3d 1000, 1004 (5th Cir. 2000).

In a federal *habeas corpus* proceeding, great deference must be given to the factual findings in the state-court proceedings because review of the sufficiency of the evidence does not include review of the *weight* of the evidence or the *credibility* of the witnesses—those determinations are the exclusive province of the jury.  *United States v. Young*, 107 F. App'x 442, 443 (5th Cir. 2004) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993); *see Jackson*, 443 U.S. at 319 (it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). A reviewing federal *habeas* court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact finder.  *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985). Thus, all credibility choices and conflicting inferences must be resolved in favor of the verdict.  *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005).  In addition, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'" *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)) (emphasis added).

2. <u>Analysis</u>

On this issue, the sole question before this Court is whether the First Circuit's decision denying Hebert's sufficiency challenge "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). This Court cannot say, based on its review of the extensive record in this case, that the First Circuit's decision was objectively unreasonable.

Six expert witnesses testified at Hebert's trial: two for the State and four for the defense. The very fact that the jury heard this conflicting testimony from *court-approved* experts ultimately dooms Hebert's sufficiency-of-the-evidence claim. In this analysis, it is of no moment that the defense called twice as many expert witnesses as the State because "conflicting expert testimony invites juries to make a credibility determination, not to tally which side produced more experts." *See Chester v. Thaler*, 666 F.3d 340, 349 (5th Cir. 2011), *cert. denied*, ––– U.S. ––––, 133 S.Ct. 525, 184 L.Ed.2d 338 (2012); *compare Strickland v. Francis*, 738 F.2d 1542, 1551 (11th Cir. 1984) (noting the significance of conflicting testimony for a *Jackson* claim).

This Court is explicitly prohibited from engaging in a credibility analysis; it is the province of the jury "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. As compelling as the defense experts and physical evidence may have been, the State presented evidence – including the testimony of two expert witnesses – that supported its theory that Hebert was not insane at the time of the offense. Looking at this evidence in the light most favorable to the State, as the *Jackson* standard demands, this Court cannot say that a rational juror *must* have found Hebert not guilty by reason of insanity. *See Ramirez*, 398 F.3d at 695

(all credibility choices and conflicting inferences must be resolved in favor of the verdict); *Morris v. Attorney Gen. of State of California*, 36 F. App'x 235, 237-38 (9th Cir. 2002) (on *habeas* review, federal court must "respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict") (citation omitted).   Accordingly, Hebert's sufficiency-of-the-evidence claim is without merit.

### B.  Ineffective Assistance of Trial Counsel

Hebert makes three distinct claims of ineffective assistance of counsel: (1) trial counsel was ineffective for failing to challenge the State's use of its peremptory challenges under *J.E.B./Batson*; (2) trial counsel was ineffective for failing to investigate a seizure disorder that may have "caused [Hebert's] psychotic break" and (3) appellate counsel was ineffective for failing to challenge the warrantless search of Hebert's home.[32]  Hebert raised these claims in state post-conviction proceedings and they were denied by the Louisiana Supreme Court in a written opinion.[33]  As discussed below, these claims are without merit.

#### 1.   Standard of Review on Ineffective Assistance Claims

The standard for judging the performance of counsel was established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom.  *See* 466 U.S. at 697.  The petitioner has the burden of proving ineffective assistance of counsel by a

---

[32] Rec. Doc. No. 1.  Although Hebert ordered her claims differently, this Court will address all three *Strickland* challenges together.
[33] Rec. Doc. No. 1; *Hebert*, 182 So. 3d at 27.

preponderance of the evidence. *See Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000); *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992). In deciding ineffective-assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. *See Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995).

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F .3d 438, 450 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002). "The defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88; *see also Cantu v. Thaler*, 632 F.3d 157, 163 (5th Cir. 2011). The analysis of counsel's performance must take into account the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances. *See Strickland*, 466 U.S. at 689; *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009). The reviewing court must "'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Roe v. Flores–Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of her counsel falls within a wide range of reasonable representation. *See Harrington v. Richter*, 131 S.Ct. 770, 787 (2011) (*citing Strickland*, 466 U.S. at 689).

In order to prove prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010). Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just

allege, prejudice." *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695). In this context, "'a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen*, 131 S.Ct. at 1403 (quoting *Strickland*, 466 U.S. at 694). This standard requires a "substantial," not just "conceivable," likelihood of a different result. *Harrington*, 131 S.Ct. at 791.

In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett v. McCotter*, 796 F.2d 787, 793 (5th Cir. 1986). Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal *habeas* relief. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)), *cert. denied*, 531 U.S. 849 (2000).

On *habeas* review, the United States Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington*, 131 S.Ct. at 788. The *Harrington* Court went on to recognize the high level of deference owed to a state court's findings under *Strickland* in light of AEDPA standards of review:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Id.* at 788 (citations and quotation marks omitted).

Accordingly, scrutiny of counsel's performance under § 2254(d) is "doubly deferential." *Cullen*, 131 S.Ct. at 1403 (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009)). The federal courts must take a deferential look at counsel's performance under the *Strickland* standard through the "deferential lens of § 2254(d)." *Id.* (citing *Strickland*, 466 U.S. at 689 and quoting *Knowles*, 129 S.Ct. at 1419 n. 2). Furthermore, the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 689–90); *see also Matheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

The *Strickland* standard also applies to claims of ineffective assistance of appellate counsel. *Duhmel v. Collins*. 955 F.2d 962, 967 (5th Cir. 1992) (citing *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991)). In reviewing claims of ineffective assistance of appellate counsel, the Supreme Court has expressly observed that appellate counsel "need not advance every argument, regardless of merit, urged by the [] defendant. *Evitts v. Lucey*, 469 U.S. 387, 394 (1985). When alleging ineffective assistance of appellate counsel, the defendant "must show that the neglected claim would have had a reasonable probability of success on appeal." *Duhmel*, 955 F.2d at 967. However, failing to raise every meritorious claim on appeal does not make counsel deficient. *Green v. Johnson,* 116 F.3d 1115, 1125-26 (5th Cir. 1997) (citing *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir. 1989)). Similarly, failing to raise a frivolous claim "does not cause counsel's performance to fall below an objective level of reasonableness." *Id.* at 1037. Courts give great deference to professional appellate strategy and applauds counsel for "winnowing out weaker arguments on appeal and focusing on one central issue if possible, and at most a few key issues. . . ." *Jones v. Barnes*, 463 U.S. 745 (1983). This is true

even where the weaker arguments have merit.  *Id.* at 751–2.  Instead, the applicable test is whether the omitted issue was "clearly stronger" than the issue[s] actually presented on appeal.  *See*, *e.g.*, *Diaz v. Quarterman*, 228 F. App'x 417, 427 (5th Cir. 2007); *see also Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).

2.  Ineffective Assistance of Counsel for Failing to Make a
*J.E.B./Batson* Challenge

In her first ineffective-assistance-of-counsel claim, Hebert contends the State unlawfully struck qualified prospective female jurors on the basis of their gender and counsel was ineffective for failing to raise challenges to those improper strikes.[34]  She argues that prejudice is presumed "where trial counsel fails to object where a prima facie case of discrimination exists because discrimination in jury selection is a structural error."

Specifically, Hebert claims that the State discriminated against female jurors when it used all of its peremptory strikes to remove women from the jury.[35]  Hebert raised this same claim in her state post-conviction application and, in the last reasoned state-court opinion, the Louisiana Supreme Court denied the claim on its merits.[36]  That court wrote: "Relator fails to show that she received ineffective assistance of trial counsel under the standard of *Strickland*, 466 U.S. 668."[37]  The Louisiana Supreme Court explicitly relied upon the post-conviction findings of the trial court that

> there were many sufficiently gender-neutral explanations for the use of peremptory challenges including:  religious, moral or ethical considerations, self-employed business owners, jurors with medical or psychiatric problems, jurors with family members that had psychiatric problems, one juror who knew the

---

[34] Rec. Doc. No. 1.

[35] *Id.* In its reply the State notes that it only used 11 of its peremptory challenges before a full jury was seated and only used the remaining of its "additional, yet entirely separate," peremptory challenges for the selection of alternate jurors pursuant to La.C.Cr.P. art. 789.  Rec. Doc. No 8, p. 9.

[36] *Hebert*, 182 So. 3d 23.

[37] *Id.*

defendant, and those jurors that had misgivings about imposing the death penalty.[38]

The trial court also concluded that, even had counsel's performance been insufficient, Hebert had not shown any prejudice arising from that deficiency.[39]  The trial court also held that trial counsel were not deficient because they "used their experience and training in the most skillful manner to properly defend petitioner against the charges."[40]  Because the state courts rejected the ineffective assistance of counsel claims on the merits and such claims present a mixed question of law and fact, this Court must defer to the state-court decision unless it was "contrary to or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir.).

Because it is undisputed that Hebert's counsel did not lodge any objections to the State's use of peremptory challenges, the Court must apply the two-pronged *Strickland* analysis to that alleged omission by counsel.  Turning first to the deficient-performance prong, Hebert "bears the burden of demonstrating [that trial counsel's] performance was outside the wide range of reasonable professional assistance and must overcome a strong presumption of adequacy."  *Clark v. Collins*, 19 F.3d 959 (5th Cir. 1994).  The AEDPA, however, adds a second layer of deference to trial counsel's perspective on the jury selection proceedings.  *Burt v. Titlow*, –––U.S. ––––, 134 S.Ct. 10, 13, 187 L.Ed.2d 348 (2013) ("[O]ur cases require that the federal court use a doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt.") (quotation omitted).

---

[38] *Id*.  As noted above, the Louisiana Supreme Court incorporated in its opinion the written reasons for ruling issued by the state district court.

[39] *Id*.

[40] *Id*.

As the United States Supreme Court has cautioned, this Court's analysis must attempt to "eliminate the distorting effects of hindsight, reconstruct the circumstances of counsel's challenged conduct, and evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *Ramirez v. Stephens*, 641 F. App'x 312, 322 (5th Cir. 2016) (a decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness).

While Hebert does point to a fact that might be troubling on its face and in a vacuum, *i.e.*, that the State used all of its peremptory challenges on women,[41] that fact alone does not afford her *habeas* relief in the absence of any challenge to the strikes by trial counsel. The question on her federal *habeas* claim for ineffective assistance of counsel is whether she can demonstrate that counsel was deficient for failing to challenge the State's peremptory strikes at the time of trial. Here, Hebert's claim of deficient performance is undermined by the record facts and, indeed, her own petition.

It is important to recall that to establish a case of intentional discrimination, the petitioner must show that the State exercised peremptory challenges to remove "member[s] of a cognizable group" and that "circumstances [are] sufficient to raise an inference that the prosecutor struck the venire person on account of being a member of that cognizable group." *State v. Givens,* 776 So.2d 443, 449 (La. 10/17/01). The relevant circumstances of the jury selection in this case simply do not allow for the conclusion that a *prima facie* case of discrimination can be made.

---

[41] Rec. Doc. No. 1

The record reflects that the final jury proper consisted of 10 females and two males, along with three males and one female chosen as alternate jurors.[42]  After the venire members were randomly drawn, 23 females and 10 males were questioned prior to the final jury selection.[43]  Of the 10 males examined, four were stricken for cause or hardship, leaving only six on the venire.  The defense used four of its peremptory challenges on those males, leaving only two males on the panel.  Given these straightforward numbers, that the State used 11 of its strikes on females is, in the final analysis, neither surprising nor indicative of a discriminatory pattern.[44]

Underlying all this are Hebert's own arguments that, intentionally or not, demonstrate a clear strategic reason why trial counsel would choose not to make a *J.E.B./Batson* challenge:  if trial counsel succeeded with that challenge, the defense would risk losing favorable jurors.  Hebert writes that "side-by-side comparison of the *voir dire* statements of the struck female jurors reveals that they were as qualified, *or more qualified*, to serve on the jury and return a sentence of death [than the] male jurors who were actually seated on Hebert's jury."[45]  Hebert further notes that, "of the twelve female venire members peremptorily struck by the State, five of them conveyed unequivocal support for the death penalty and willingness to impose a death sentence on Hebert."[46]  Indeed, one juror, Mary Davidson, went so far as to "indicat[e] that, in her opinion, death would be the appropriate penalty in a factual scenario that was based on the State's version of the instant crime but

---

[42]  State Rec. Vols. 21-23, 29-39.  The Court has carefully reviewed the entire *voir dire*, which comprises some 14 volumes in the state-court record.

[43]  *Id.*

[44]  This conclusion is illustrated to an extent by an observation made by the State in its Response to the Petition, namely that if the District Attorney had truly been motivated to exclude female jurors, one would have expected him to strike the last juror seated, a female, because she would have been replaced with a male.

[45]*Id.* at 31 (emphasis added).

[46] *Id.* at 32.

that she would consider all of the evidence presented."[47]  And later, Hebert notes that "none of the female prospective jurors removed by the State was as opposed to the death penalty as some of the males ultimately selected to sit on the jury."[48]

The Court has reviewed the transcript of the *voir dire* and finds Hebert's characterization of these potential jurors' statements to be accurate and, therefore, cannot help but conclude that her trial counsel had ample strategic reasons to abstain from making *J.E.B/Batson* challenges regarding any number of the State's strikes.  In attempting to establish that the stricken jurors were death-penalty qualified, Hebert necessarily highlights a clear justification for her counsel to want them stricken – that they were death-penalty qualified.  While she escaped that sentence ultimately, that Hebert faced the death penalty at the time the jury was selected cannot be gainsaid, and efforts by counsel to exclude potential jurors who were "as qualified, or more qualified"[49] to return a death sentence simply cannot be second-guessed at this level of review.  Given the state court's factual findings and the strong deference paid to trial counsel's performance, the state court's rejection of this ineffective assistance claim was not unreasonable.  Thus, this Court need not reach the prejudice prong of the *Strickland* inquiry and Hebert's ineffective-assistance claim that counsel failed to make a *J.E.B./Batson* challenge should be denied.[50]

---

[47] *Id.* at 33.

[48] *Id.* at 34.

[49] *Id.* at 31.

[50] Hebert presents this claim as an ineffective assistance claim rather than as a *Batson* violation claim.  She argues for a presumption of prejudice in the ineffective assistance of counsel context based upon the failure to object to the State's use of peremptory challenges to remove females and resultant structural error.  While the Court need not reach the issue of prejudice, it notes that the United States Fifth Circuit has declined to "hold that a structural error alone is sufficient to warrant a presumption of prejudice in the ineffective assistance of counsel context."  *Scott v. Hubert*, 610 F. App'x 433 (5th Cir. 2015) (quoting *Virgil v. Dretke*, 446 F.3d 598, 607 (5th Cir. 2006).

### 3.  Ineffective Assistance of Trial Counsel for Failing to Investigate Hebert's Seizure Disorder

Hebert next claims that her trial counsel was ineffective for failing to investigate a long-standing, untreated, seizure disorder that "likely caused her psychotic break."[51]   In response, the State argues that Hebert's trial attorneys were not deficient because they were aware of the seizure disorder and conveyed that information to their expert witnesses who "chose to give it very little weight."[52]   The State opines that, even had her trial attorneys (and experts) presented this alternate theory as the cause of Hebert's psychosis, Hebert still fails to prove prejudice because that theory cannot account for the "the angry letters she penned on the date of the killing."[53]   In its decision denying Hebert's claim, the Louisiana Supreme Court stated: "Relator fails to show she received ineffective assistance of trial counsel under the standard of *Strickland*, 466 U.S. 668," and attached and incorporated the trial court's post-conviction order.   That order specifically found that Hebert's trial attorneys did not render deficient performance, noting (as mentioned above), that "petitioner's counsel used their experience and training in the most skillful manner to properly defend petitioner against the charges."[54]

Through the affidavit of Dr. Merikangas, the email from Dr. Ahava, and the diagnosis of temporal lobe seizures, Hebert argues that she suffered prejudice when her trial lawyers deficiently failed to investigate her temporal-lobe seizures, which may have exacerbated (or

---

[51] Rec. Doc. No. 1.
[52] Rec. Doc. No. 8, p. 16.
[53] *Id.* at 20.
[54] *Hebert*, 182 So. 3d at 27.

even potentially caused) her psychosis.[55]  In support of this claim, Hebert relies upon an affidavit from Dr. James Merikangas.[56]  That affidavit provides evidence that Hebert wrote the two notes, not as a scorned lover, but as someone who was suffering from a labile mood.[57]  Dr. Merikangas supports this assertion by pointing to Hebert's statement, made only a week before the killings that she "wanted to move on her with her life."[58]  Further, Dr. Merikangas' affidavit rebuts the State's claim that Hebert could not have been in a psychotic state for such a short period of time and he also explains why "it is not surprising that [a] [taser] shock brought her around to awareness."[59]

Hebert has not demonstrated that her counsel's performance was deficient.  *See Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994), *cert. denied*, 513 U.S. 960, 115 S.Ct. 418, 130 L.Ed.2d 333 (1994)) (in deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test).  To do so, she must establish that counsel "made errors so serious that he was not functioning as the 'counsel' guaranteed to the defendant under the Sixth Amendment."  *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.  On federal *habeas* review, scrutiny of counsel's performance "must be highly deferential," and the court will "indulge a strong presumption that strategic or tactical

---

[55] Rec. Doc. No. 1. Supp. Exh. 1, 7, 8. Dr. Merikangas' affidavit does not indicate that he would have, in fact, been available to testify at trial.  Notwithstanding this, however, the Court will consider the affidavit because of its substantial compliance with Hebert's burden for claims of failure to investigate.  In order to demonstrate prejudice arising from the failure to call witnesses, a petitioner must identify the witnesses, explain the content of their proposed testimony, show that their testimony would have been favorable to the defense, and demonstrate that the witnesses were available and willing to testify at trial.  *See Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *See also Anthony v. Cain*, Civ. Action 2009 WL 3564827, No. 07–3223 at 8 (E.D.La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue.").
[56] Rec. Doc. No. 1-13.
[57] *Id.*
[58] Rec. Doc. No. 1. Supp. Exh. 13-8.
[59] *Id.*

decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 689–90). Under this standard, the petitioner bears the burden to show that counsel's performance fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687-88, 104 S.Ct. 2052.

Further, every effort must be undertaken "'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *United States v. Harris*, 408 F.3d 186, 189 (5th Cir. 2005) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

A "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill-chosen that it permeates the entire trial with obvious unfairness." *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (citations and internal quotation marks omitted). However, "strategic choices made after less-than-complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 521, 123 S.Ct. 2527 (internal quotation marks and alteration omitted) (quoting *Strickland*, 466 U.S. at 690-91, 104 S.Ct. 2052). When assessing the reasonableness of an attorney's investigation, we must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527, 123 S.Ct. 2527.

The weakness of Hebert's deficiency argument vis-à-vis the seizure investigation is particularly clear when juxtaposed against her prejudice argument. Unlike Hebert's prejudice claim, which is accompanied by direct evidence, in the form of affidavits,

documents and emails, Hebert's deficiency claim conspicuously lacks any such supplemental evidence.   Here, there is no evidence that there was anything further for counsel to investigate – indeed, the record shows that counsel *actually had* information about the existence and effects of Hebert's frontal-lobe seizures.[60]  Page 11 of Dr. Ahava's report reads:

> At the age of 20 years old, [Hebert] was in an automobile accident in which she was the passenger in the front seat of a pickup truck, sitting in the middle.  She suffered a concussion and was hospitalized.   She reported experiencing changes in mood following that event.  Hebert developed a seizure disorder and was placed on a variety of anti-seizure medications over the ensuing years.
>
> ...
>
> In conclusion, Dr. Gaddis opined that Hebert had "temporal lobe seizures." This is relevant to the extent that this classification of seizures often co-exists with mood disturbances that appear similar to manic depression.

Rec. Doc. No. 1, Exh. 2, p. 11.

Although Hebert offers no evidence about trial counsel's investigative choices, there are viable strategic reasons why counsel might have focused on Hebert's depression instead of her seizures.  For instance, counsel may have wanted to direct the jury to Hebert's most recent mental illness and worried that bringing up an old seizure disorder would just confuse the jury.  *Yeboah-Sefah v. Ficco*, 556 F.3d 53, 76 (1st Cir. 2009) (noting that trial counsel's decision to disregard one of two different diagnoses for an insanity defense was a strategic decision and therefore not deficient performance because of the potential to confuse the jury).

Hebert, who bears the burden of proof, offers no evidence that the other medical experts who testified at trial – Drs. Self, Resnick and Phillips – thought the seizure disorder

---

[60]  See Rec. Doc. No. 1, Exh. 1, p. 2; Exh. 2, p. 11.

played a significant role in Hebert's psychotic break and thus should have been investigated further and introduced at trial. *Escamilla v. Stephens*, 749 F.3d 380, 392 (5th Cir. 2014) (if a purportedly tactical decision is not preceded by *a reasonable investigation*, then it is not sufficiently informed and not entitled to the deference typically afforded counsel's choices). To be sure, the use of three separate doctors to evaluate Hebert for psychiatric problems amounts to a "reasonable investigation" and her trial counsel's decisions are afforded great deference. This claim is therefore without merit.

### C. *Ineffective Assistance of Appellate Counsel for Failing to Challenge the Search of Hebert's Home*

Hebert's final claim of ineffective assistance of counsel is that her appellate counsel failed to challenge the warrantless search of her home.[61] On direct appeal, Hebert's appellate counsel raised six claims: (1) the trial court erred when it denied the post-verdict judgment of acquittal; (2) the trial court erred when it denied Hebert's motion for a new trial; (3) there was insufficient evidence to conclude that Hebert was guilty; (4) the trial court erred when it limited Dr. Spitz' testimony; (5) the trial court erred when it denied Hebert's motion for a change of venue and (6) the trial court imposed an excessive sentence by making the life sentences consecutive. [62] After raising the issue of the warrantless search on post-conviction, the Louisiana Supreme Court denied the claim in the last reasoned state court opinion:

> Relator also fails to show appellate counsel "ignored issues ... clearly stronger than those presented," *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000) (citation and internal quotation marks omitted), and that there was a "reasonable probability" she would have prevailed on the omitted claim on appeal. *Mayo v. Henderson*, 13 F.3d 528, 533–34 (2d Cir. 1994).

---

[61] Rec. Doc. No. 1.
[62] State Rec. Vol. 43 of 45; *State v. Hebert*, 57 So.3d 608 (La. App. 1st Cir. 2011), No. 2010-KA-0305.

*Hebert*, 182 So. 3d at 23.  The court attached and incorporated the trial court's written ruling in its opinion.  In relevant part, that opinion stated:

> Petitioner, in her *Reply to the State's "Answer to Application to Post Conviction Relief,"* did not claim that the initial entry into her home was unlawful. Petitioner complaints [sic] are of the subsequent "warrantless" search of her home and the seizure of evidence taken during that search.
>
> Officers did not enter petitioner's home until they heard cried of distress from petitioner's father-in-law, Buck Hebert, who entered petitioner's home out of fear and concern for petitioner and her children.  When Mr. Hebert called for help, the officers entered the home.
>
> Upon entering the home and observing large amounts of blood, the officer's [sic] began their search for the cause of the blood and to determine if its residents of were safe.  Because it was difficult to determine what had taken place, once the scene in petitioner's bedroom was secured, officers conducted a protective sweep to secure the premises.  The evidence seized from petitioner's home and introduced into evidence was observed in "plain view" by the officers while in the home, and the evidence seized were those objects that were lying in plain view and had the obvious presence of blood.  See *State v. Brown*, 370 So.2d 525 (La. 1979).
>
> If appellate counsel for the petitioner had asserted this claim on appeal, the appellate court would have been found the claim to be meritless.  Thus, counsels' alleged failure to assert the claim has not prejudiced the applicant. This claim has no merit.

*Hebert*, 182 So. 3d at 26.  The State argues, as the Louisiana Supreme Court held, that the officers did not violate the Fourth Amendment in that an exigency justified their initial entry into the home and, once they were inside the house, the blood-splattered notes were clearly evidence and were in plain view.[63]

When a petitioner claims that the failure to raise an issue on appeal constitutes ineffective assistance of appellate counsel, the prejudice prong of *Strickland* requires the

---

[63] Rec. Doc. No. 8, p. 23.

petitioner to establish that, had the issue been raised, the appellate court would have granted relief. *United States v. Phillips*, 210 F.3d 345, 350 (5th Cir. 2000). Hebert cannot meet this burden.

Police may seize evidence under the plain-view doctrine when: (1) their intrusion into the protected area is justified and (2) it is immediately apparent, without close inspection, that the items seized are evidence or contraband. *Horton v. California*, 496 U.S. 128, 135–136, 110 S.Ct. 2301, 2307, 110 L.Ed.2d 112 (1990). The plain-view doctrine is a recognized exception to the rule that a search or seizure conducted without a warrant is presumed to be unreasonable. *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971); *State v. Smith*, 982 So.2d 821 (La. App. 5 Cir. 3/11/08). Because all parties agree that the police's initial entry into the home was lawful, the sole issue on appeal would have been whether it was immediately apparent that the bloody notes were evidence. *Michigan v. Tyler*, 436 U.S. 499, 509–510, 98 S.Ct., 1942, 1950–1951 (1978).[64] This is not Hebert's argument, however – instead, she challenges the officers' "exhaustive" search of her home.[65]

In support of her argument, Hebert relies on *Mincey v. Arizona*, 437 U.S. 385 (1978). In *Mincey*, the Supreme Court held that there is no general "murder scene" exception to the Fourth Amendment's warrant requirement. However, *Mincey* also endorsed the application of the plain-view doctrine in the warrantless investigation of murder scenes:

> We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of

---

[64] Hebert does not challenge the police's initial entry of the house or their continued presence therein. *Hebert*, 182 So. 3d at 26.

[65] Rec. Doc. No. 1.

immediate aid.  Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises.  The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.  *And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities.*

*Id.* at 391 (citations and quotations omitted) (emphasis added).

Here, the blood-stained notes were clearly incriminating and were thus excepted from the warrant requirement under the plain-view doctrine.  Louisiana and federal courts have held that blood-stained items inherently have evidentiary value and therefore fall within the "immediately apparent" prong of the plain-view doctrine.

For instance, in addressing a similar set of facts, the Louisiana Fifth Circuit Court of Appeal determined that a bloody palm print was immediately apparent as evidence and thus fell within the plain-view doctrine:

> When the responding police officers, from their lawful vantage point, saw the unconcealed bloody palm print on the kitchen countertop, *it was immediately apparent that they had important forensic evidence before them.  The discovery of such probative evidence warranted its immediate preservation.*
>
> This Court has recently emphasized the application of the plain view doctrine: evidence in open or plain view of a police officer legally on the premises is subject to seizure without a warrant.  *State v. Nicholas*, 06–903, p. 6 (La.App. 5 Cir. 4/24/07), 958 So.2d 682, 698.
>
> ...
>
> The case of *State v. Robichaux*, 00–1234 (La.App. 4 Cir. 3/14/01), 788 So.2d 458, writ denied, 01–1178 (La.3/15/02), 811 So.2d 897, is illustrative of the application of constitutional principles.  In *Robichaux*, the warrantless seizure of a bloody hammer was upheld under the plain view doctrine.  Police officers were informed that someone in a nearby home needed assistance. Upon responding to the emergency call, the officers saw blood on the ground and porch of the defendant's home and heard the victim moaning.  Upon entering the house, officers saw blood on the floors and walls and learned that the victim had been beaten with a hammer.  For officer safety and preservation of evidence, the officers conducted a security sweep of the premises.  As they did

so, in plain view, the officers found a bloody hammer near the back door.  The seizure of this bloody hammer was upheld on appeal.

*State v. Simmons*, 996 So. 2d 1177, 1186 (La. App. 5 Cir. 10/28/08), *writ denied,* 18 So. 3d 81 (La. 9/25/09); *see also United States v. Chipps*, 410 F.3d 438, 443 (8th Cir. 2005) (when an agent legally arrived at a place from which he observed a bloody sweatshirt, the incriminating nature of that bloody sweatshirt – at the site of a potential assault – was obvious; therefore the plain-view doctrine justified his seizure of the sweatshirt); *State v. Chapman*, 410 So. 2d 689, 700 (La. 1981) (holding that bloodstains on clothing that matched the description of the crime made it immediately apparent that the items were evidence of the commission of the crime").

In Hebert's case, the officers were securing a crime scene when they noticed the blood-stained notes.  Specifically, paramedic Tracy Adam Gambarella noticed the note while he was inside the house to check the children for signs of life.[66]  Unlike *Mincey* where detectives returned and proceeded to conduct an exhaustive four-day warrantless search of the apartment, which included the opening of dresser drawers, the ripping up of carpets, and the seizure of 200-300 objects, the note in this case was not only in plain view, it was also immediately apparent as evidence because it was stained in blood.  *Mincey* 437 U.S. 385.

Accordingly, as discussed above – and as noted by the Louisiana Supreme Court in the last reasoned state court opinion – this claim fails because it is not "clearly stronger" than the sufficiency claim that appellate counsel brought on direct appeal.  *See*, *e.g.*, *Diaz v. Quarterman*, 228 F. App'x 417, 427 (5th Cir. 2007); *see also Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (explaining that the relevant test is whether the

---

[66] State Rec. Vol. 5 of 45; (motions hearing 6/17/2008, p. 122)

omitted issue is "clearly stronger than the issues actually brought on appeal). Hebert cannot

show that, had appellate counsel raised this issue on appeal, the outcome would have been

different. For the foregoing reasons, this claim should be denied.

### D. *Jury Misconduct*

Hebert's fourth and fifth claims allege juror misconduct in violation of her rights to

due process and an impartial jury.[67] First, Hebert contends that her constitutional rights

were violated by the jury's consideration of extraneous evidence that was not admitted at

trial. Specifically she claims that juror Erin Folse, a nurse, offered impermissible medical

opinions about Hebert's self-inflicted wounds during deliberations.[68] Second, Hebert

contends that the jurors engaged in premature deliberations.[69]

### 1. Standard of Review

As to these two jury-misconduct claims, the State argues that the state district court's

decision addressed the merits of both claims, thereby triggering application of the strict

standards of § 2254(d)(1).[70] In response, Hebert argues that the court's rulings on the

---

[67] Rec. Doc. No. 1, p. 99-122

[68] *Id*. at 103-115

[69] Rec. Doc. No. 1. The Court notes that the State's response submits in the alternative that Hebert's jury misconduct claims were procedurally barred based on independent and adequate state-law grounds (*i.e.* procedurally default). Rec. Doc. 8, pp. 25-28. However, given the complexity of the procedural bar analysis and the fact that the claims plainly fail on the merits in any event, the Court will proceed to the alternative merits review. *Taylor v. Thaler*, 397 F. App'x 104, 107 (5th Cir. 2010) (citing *Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir. 2004)); *see also Hudson v. J*ones, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.").

[70] That provision states that

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

extraneous-evidence and premature-deliberation claims were procedural, thus entitling her to *de novo* review.[71]

The transcript of the state district court's April 8, 2013 hearing on Hebert's motion to strike pleadings and exhibits makes it clear that the court's rulings were merits-based.[72] First, the court found no evidence that Nurse Folse ever shared her medical opinion about the ultimate question of whether Hebert could distinguish right from wrong and thus it was unable to determine whether Hebert suffered prejudice, *i.e.*, that she was denied due process.[73]  The trial court also noted that, to the extent Ms. Folse offered her opinions, those opinions were not extraneous to the proceedings.  Rather, "she made comments about statements made by other medical witnesses in the trial, which is exactly what the juror shield law is designed to defeat."[74]

The Fifth Circuit addressed a similar issue in *Salazar v. Dretke*, 419 F.3d 384, 398 (5th Cir. 2005).  In *Salazar*, the defense sought to present testimony of four jurors about the jury's deliberations.  *Id*.  The Fifth Circuit held that the trial court made a substantive determination when it "left Salazar with no admissible evidence to support his due process claim...."  *Id.* at 389.   The Fifth Circuit went on: "The state habeas court's ruling, therefore, was not a procedural ruling in which the court dismissed Salazar's claim as improperly before the court.  Rather, the state court's decision was a substantive determination that Salazar's claim

---

[71] Rec. Doc. No. 1, p. 99-122.  Hebert argues that she is entitled to *de novo* review of her claim of "extraneous information" because the trial court "repeatedly misstated the applicable legal standard."  Rec. Doc. No. 1, p. 112. This argument is not well-taken.  "Whether a state court interpreted a (state) evidentiary rule correctly is generally not of concern to a federal court on habeas."  *See Panzavecchia v. Wainwright,* 658 F.2d 337, 340 (5th Cir. 1981); *Allen v. Cain*, No. CIV.A. 09-0218, 2014 WL 573181, at *14 (W.D. La. Feb. 13, 2014).

[72] Rec. Doc. No. 1-10.

[73] *Id.*  Subsequent to the trial court's ruling, Hebert filed a writ applications that was denied by the Louisiana First Circuit Court of Appeal on April 20, 2015. Rec. Doc. No. 1-17; 2015-KW-0289.

[74] *Id.*

was unsupported by any evidence and that Salazar's due process rights had not been violated." *Salazar*, 419 F.3d at 398; *see also Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir. 2003) (holding that among the factors relevant to determining whether a claim was dismissed on the merits was whether the state courts' opinions suggested reliance upon a determination on the merits rather than procedural grounds).

Here, as in *Salazar*, the trial court excluded the evidence about Nurse Folse's statements on the merits rather than making a purely procedural ruling that "dismiss[ed] the juror testimony as improperly before the court." *Salazar*, 419 F.3d at 398.[75]  Likewise, the trial court extended this analysis in denying the premature deliberation claim on the merits, noting: "there's no specifics about pre-trial or premature deliberations actually leading to some misconduct that could possibly be construed to have affected the verdict in this case."[76]

More recently, the Fifth Circuit reaffirmed the appropriate standard of review when it considered the denial of *habeas* relief based on a state court's ruling that a juror's affidavit supporting a jury misconduct claim was inadmissible under Louisiana Code of Evidence article 606(B).  *Allen v. Vannoy*, 2016 WL 4254375, at *4-5 (5th Cir. 2016).  In *Allen*, the state *habeas* court "held the affidavit inadmissible because it did not demonstrate the exertion of outside influence on the jury or indicate the jury was exposed to any extraneous prejudicial information."  *Id.* at *5.  The Fifth Circuit stated that an evidentiary ruling under 606(B) is a question of law to which § 2254(d)(1) deference applies.  Additionally, the Fifth Circuit noted

---

[75]  As was noted by the court in *Henderson v. Cockrell*, the state court here clearly relied upon a determination of the merits in its decision, even if it also pointed to the lack of sufficiently specific fact pleading in Hebert's petition in denying her claim.  *Henderson*, 333 F.3d at 598.
[76] *Id.* at 32

that whether the court's ruling was correct under state law is of no moment, stating "federal courts sitting in habeas do not review state courts' application of state evidence law. Therefore, we assume without deciding that the state court correctly applied state law to exclude the affidavit." *Id*. "A state court's evidentiary rulings present cognizable habeas claims only if they run afoul of a specific constitutional right or render a petitioner's trial fundamentally unfair." *Id*. (citations omitted). Similarly, this Court will not review whether the state court correctly applied state law, but rather, considers only the overriding federal constitutional question with respect to that ruling. Furthermore, the state-court ruling will be accorded deferential review under § 2254(d)(1).

>    2.    The Law Concerning Post-Verdict Inquiry Into Jury Deliberations

Courts are generally barred from post-verdict inquiries into matters involving jury deliberations. The reasons are obvious: "Courts properly avoid such explorations into the jury's sovereign space, and for good reason. The jury's deliberations are secret and not subject to outside examination." *Yeager v. United States*, 129 S.Ct. 2360, 2368 (2009) (citations omitted). This principle was codified in Federal Rule of Evidence 606(B). Later, Louisiana Code of Evidence Article 606(B) codified the same rule, modeling the provision after the federal rule.[77]

Louisiana's jury-shield law expressly prohibits inquiry into the validity of a verdict, with only two exceptions. The article reads:

> B. Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything

---

[77] La.Code Evid. art. 606, Comment (b) ("Paragraph B of this Article follows Federal Rule of Evidence 606(b) with respect to criminal cases."); *State v. Hailey*, 953 So.2d 979, 984 (La. App. 2nd Cir. 2007) ("This article is closely related, at least in criminal cases, to Federal Rule of Evidence 606").

upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, [1] except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, [2] whether extraneous prejudicial information was improperly brought to the jury's attention.  Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

LSA–C.E. art. 606(B).  The United States Third Circuit Court of Appeal[78] explained the

rationale behind the exceptions:

[T]here is a clear doctrinal distinction between evidence of improper intra-jury communications and extra-jury influences. It is well-established that the latter pose a far more serious threat to the defendant's right to be tried by an impartial jury. It has long been recognized that when jurors are influenced by the media and other publicity, or when they engage in communications with third parties, these extra-record influences pose a substantial threat to the fairness of the criminal proceeding because the extraneous information completely evades the safeguards of the judicial process.

*United States v. Resko*, 3 F.3d 684, 690 (3rd Cir. 1993) (citations omitted).

Although this prohibition may at times lead to seemingly unjust results, the

United States Tenth Circuit Court of Appeals explained the prohibition's greater

purposes:

The rule against impeachment of a jury verdict by juror testimony as to internal deliberations may be traced back to "Mansfield's Rule," originating in the 1785 case of *Vaise v. Delaval*, 99 Eng. Rep. 944 (K.B.1785).  Faced with juror

---

[78] Due to the dearth of relevant jurisprudence interpreting LSA–C.E. art. 606(B), this Court has looked to federal jurisprudence interpreting the similar federal rule, which is appropriate under the circumstances. *See, e.g.,* La. Code Evid. art. 102, Comment (a) ("[T]he adoption of this Code facilitates the movement towards a uniform national law of evidence.  Thus, especially where the language of the Louisiana Code is identical or virtually identical with that used by other states or in the federal rules, Louisiana courts now have available a body of persuasive authority which may be instructive in interpreting the Louisiana Code.").

testimony that the jury had reached its verdict by drawing lots, Lord Mansfield established a blanket ban on jurors testifying against their own verdict. The rule was adopted by most American jurisdictions and "[b]y the beginning of [the twentieth] century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict." *Tanner v. United States*, 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). This common-law principle, together with exceptions also developed by common law, was eventually codified into Federal Rule of Evidence 606(b).

Rule 606(b) is a rule of evidence, but its role in the criminal justice process is substantive: it insulates the deliberations of the jury from subsequent second-guessing by the judiciary. Jury decision-making is designed to be a black box: the inputs (evidence and argument) are carefully regulated by law and the output (the verdict) is publicly announced, but the inner workings and deliberation of the jury are deliberately insulated from subsequent review. Judges instruct the jury as to the law, but have no way of knowing whether the jurors follow those instructions. Judges and lawyers speak to the jury about how to evaluate the evidence, but cannot tell how the jurors decide among conflicting testimony or facts. Juries are told to put aside their prejudices and preconceptions, but no one knows whether they do so. Juries provide no reasons, only verdicts.

To treat the jury as a black box may seem to offend the search for perfect justice. The rule makes it difficult and in some cases impossible to ensure that jury verdicts are based on evidence and law rather than bias or caprice. But our legal system is grounded on the conviction, borne out by experience that decisions by ordinary citizens are likely, over time and in the great majority of cases, to approximate justice more closely than more transparently law-bound decisions by professional jurists. Indeed, it might even be that the jury's ability to be irrational, as when it refuses to apply a law against a defendant who has in fact violated it, is one of its strengths. *See* John D. Jackson, *Making Juries Accountable*, 50 Am. J. Comp. L. 477, 515 (2002).

If what went on in the jury room were judicially reviewable for reasonableness or fairness, trials would no longer truly be by jury, as the Constitution commands. Final authority would be

exercised by whomever is empowered to decide whether the jury's decision was reasonable enough, or based on proper considerations. Judicial review of internal jury deliberations would have the result that "every jury verdict would either become the court's verdict or would be permitted to stand only by the court's leave." *Carson v. Polley*, 689 F.2d 562, 581 (5th Cir.1982).

Defendants undoubtedly have a powerful interest in ensuring that the jury carefully and impartially considers the evidence. This case presents that interest to the highest degree. But there are compelling interests for prohibiting testimony about what goes on in the jury room after a verdict has been rendered. The rule protects the finality of verdicts. It protects jurors from harassment by counsel seeking to nullify a verdict. It reduces the incentive for jury tampering. It promotes free and frank jury discussions that would be chilled if threatened by the prospect of later being called to the stand. Finally, it preserves the "community's trust in a system that relies on the decisions of laypeople [that] would all be undermined by a barrage of post-verdict scrutiny." *Tanner*, 483 U.S. at 121, 107 S.Ct. 2739; see also *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1548 (10th Cir.1993) ("[T]he rule against jurors impeaching their own verdict is designed to promote the jury's freedom of deliberation, the stability and finality of verdicts, and the protection of jurors against annoyance and embarrassment."); *Gov't of the V.I. v. Gereau*, 523 F.2d 140, 148 (3d Cir.1975) (listing these five policies behind the rule).

Like other rules of evidence protecting the confidentiality of certain communications, such as the attorney-client privilege or the priest-penitent privilege, Rule 606(b) denies the court access to what may be relevant information—information that might, for example, justify a motion for a new trial. But like these other privileges, the rule protects the deliberative process in a broader sense. It is essential that jurors express themselves candidly and vigorously as they discuss the evidence presented in court. The prospect that their words could be subjected to judicial critique and public cross examination would surely give jurors pause before they speak. *See Tanner*, 483 U.S. at 120, 107 S.Ct. 2739 ("If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to

> the destruction of all frankness and freedom of discussion and conference.") (*quoting McDonald v. Pless*, 238 U.S. at 267–68, 35 S.Ct. 783).   Moreover, part of the urgency that comes from knowing that their decision is the final word may be lost if jurors know that their reasoning is subject to judicial oversight and correction.

*United States v. Benally*, 546 F.3d 1230, 1233–34 (10th Cir. 2008).

Similarly, the United States Supreme Court has noted:

> There is little doubt that post-verdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it.   Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process.   Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of post-verdict scrutiny of juror conduct.

*Tanner*, 483 U.S. at 120–21 (citations omitted).

Accordingly, the evidence Hebert proffered about jury deliberations was only admissible if the alleged impropriety involved (1) an outside influence improperly brought to bear upon a juror; or (2) extraneous prejudicial information improperly brought to the jury's attention.   Here, Hebert makes no allegation of an improper "outside influence"; therefore, the Court need only consider whether Hebert's claim involves "extraneous prejudicial information."

> ### 3.   Jury Misconduct through Extraneous Evidence

In support of her claim that improper extraneous information was introduced during jury deliberations, Hebert proffered at the April 8, 2013 post-conviction hearing the

statement of juror Alma Crochet.  According to that statement, Nurse Folse told the other jurors that, because Hebert cut around her eyes, she did not believe that Hebert really intended to cut out her eyes.[79]  Hebert also presented the affidavits of investigators Annie Preziosi and Ashley Cusick.  When they interviewed Nurse Folse about jury deliberations, Nurse Folse stated: "I'm a nurse.  One ER nurse [who testified] said [Hebert] was catatonic and that they had to sedate her or use a drug to get a chest tube in.  A catatonic person wouldn't need that.  For medical stuff the jury would turn to me."[80]

According to Hebert, Nurse Folse thereby offered "evidence" contradicting the defense theory "that Hebert was following the command of an auditory hallucination."[81] Hebert similarly argues that Ms. Folse used her medical expertise to instruct the other jurors "that Hebert was lucid enough to protect herself from permanent injury or, perhaps, was even staging the entire injury to match her alleged hallucination."[82]

After review of the evidence and law, this Court concludes that the state district court was correct in finding that Nurse Folse's opinions did not constitute "extraneous prejudicial information."

First, Nurse Folse's opinion did not enter the jury room through an *external* and prohibited contact, communication, or public statement; rather, her statements reflected pre-existing knowledge brought to the jury room by one of the jurors.  *See United States v. Brito*, 136 F.3d 397, 414 (5th Cir. 1998) (a jury's verdict may be impeached only by evidence that the verdict was influenced by *outside* sources); *United States v. Gonzales*, No. 92–2118,

---

[79] Rec. Doc. No. 1-6.
[80] Rec. Doc. No. 1, p. 106.
[81] *Id.*
[82] Rec. Doc. No. 1, p. 105

1993 WL 185718, at *7 (5th Cir. 1993) (juror's knowledge of Spanish, which allowed him to interpret for the other jurors part of an audiotape in evidence, stemmed from his personal experience and was therefore not from an extrinsic source); *see also Tanner*, 483 U.S. at 117–18 (discussing the history and application of the "external" versus "internal" distinction).

Second, the information that Nurse Folse brought to the jury was based purely on her own personal experience; it did not reflect any particularized knowledge of this petitioner or her case. *See Benally*, 546 F.3d at 1237 (when determining whether information constitutes improper extraneous information under the federal rule, the relevant inquiry is whether the information concerned specific facts about the defendant or the incident in which she was charged; "generalized statements, ostensibly based on the jurors' personal experience," do not support an actionable claim). The United States Court of Appeal for the Ninth Circuit has explained why a juror's past personal experiences are appropriately deemed part of jury deliberations:

> It is probably impossible for a person who has highly relevant experience to evaluate the credibility of witnesses without that experience bearing on the evaluation. Were we to require the impossible and prohibit jurors from relying on relevant, past personal experience, about all we would accomplish would be to induce jurors to lie about it when questioned afterward, unless we limited jury participation to the most unworldly and ignorant individuals.

> The mere fact that the jury foreman brought her outside experience to bear on the case is not sufficient to make her alleged statements violate Grotemeyer's constitutional right to confrontation. Counsel ordinarily learn during voir dire what a veniremember does for a living, and use peremptory challenges to avoid jurors whose experience would give them excessive influence.

*Grotemeyer v. Hickman*, 393 F.3d 871, 878, 880 (9th Cir. 2004). *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2nd Cir. 1994) (jurors may bring to the jury room knowledge gained from their ordinary experience, such as knowledge that "Times Square is busy all night or that there are doormen along stretches of Park Avenue"); *United States v. Holck*, 398 F.Supp.2d 338, 364–67 (E.D.Pa. 2005) ("jurors can and should draw upon prior life experiences and use them in the course of deliberations," and "[s]uch conduct does not amount to bringing in extraneous information"), *aff'd*, 500 F.3d 257 (3rd Cir. 2007), *cert. denied*, 128 S.Ct. 1329 (2008).

Furthermore, courts have routinely held that, when medical professionals use their professional experience to assist in jury deliberations, the use of that expertise is not an impermissible outside influence.  *See Grotemeyer*, 393 F.3d at 879 ("The Sixth Amendment entitles a defendant to an 'impartial' jury, not to an ignorant one.  *That a physician is on the jury does not deprive a defendant of his constitutional right to an impartial jury, even though the physician will doubtless have knowledge and experience bearing on any medical questions that may arise.*") (emphasis added); *see also State v. Weaver*, 05-169 (La. App. 5 Cir. 11/29/05), 917 So. 2d 600, 614, *writ denied,* 2006-0695 (La. 12/15/06), 944 So. 2d 1277 (finding no issue when a juror had a background in psychology); *Corines v. Superintendent, Otisville Corr. Facility*, 621 F. Supp. 2d 26, 40-41 (E.D.N.Y. 2008) (finding no juror misconduct when nurse gave jury her lay opinions regarding introduction of intravenous therapy (IV) line, when question before jury was whether unlicensed anesthesiologist employed by doctor practiced medicine by administering anesthesia and not merely by starting IV).

For all the foregoing reasons, Hebert's claim lacks merit.  Although Nurse Folse may have introduced her opinion or opinions based on professional experience into deliberations, that does not equate to the introduction of impermissible extraneous

information.  *See Grotemeyer*, 393 F.3d at 879; *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008) ("Under clearly established Supreme Court case law, an influence is not an internal one if it (1) is extraneous prejudicial information; *i.e.*, information that was not admitted into evidence but nevertheless bears on a fact at issue in the case, or (2) is an outside influence upon the partiality of the jury, such as 'private communication, contact, or tampering with a juror.' ") (citations omitted).  Accordingly, Hebert cannot show that the trial court's decision was contrary to or involved an unreasonable application of clearly established federal law.

### 4.    Jury Misconduct through Premature Deliberations

Hebert's final claim is that the jury engaged in premature deliberations.[83]  To support this claim, during state post-conviction proceedings, Hebert proffered the affidavits of three jurors.  First, Hebert provided the affidavit of Hannah Boudreaux.  In relevant part Ms. Boudreaux's affidavit stated:

> Overall I thought the lawyers did a good job, especially Cam Morvant.  The other lawyer for the defense with all the white hair didn't always make sense.  I was kind of lost on some of the stuff he said.  We would get back to the hotel and everyone would be like "did he make sense to you?" and we'd try to figure it out.

St. Rec. Vol. 44 of 45, Exh. 16.  Next, Hebert offered the declaration of Steven Arceneaux, who said:

> I think some of the jurors took the case more seriously than others.  I think some had pre-formed conclusions.  Little comments made me think that some of them didn't take the evidence as seriously and may have decided the case off the bat.

*Id.*, Exh. 17.  Finally, Hebert submitted the affidavit of Burleigh Johnson, who wrote:

---

[83] Rec. Doc. No. 1.

> *We didn't really talk about the case.*  Some people were very opinionated.  They would say things like "she deserves to die" *but mostly we didn't talk about the case.*

*Id.*, Exh. 18 (emphasis added).

In evaluating a claim of juror misconduct, the law presumes that the jury is impartial and the burden rests on the defendant to show otherwise.  *United States v. York*, 600 F.3d 347, 356–57 (5th Cir. 2010).  However, deliberations prior to the close of evidence threaten a defendant's Sixth Amendment right to trial by an impartial jury.  *Id.*  Nevertheless, trial judges have broad discretion to deal with possible jury misconduct in this regard.  *Id.*; *see United States v. Sotelo*, 97 F.3d 782, 794 (5th Cir. 1996) (noting that "the trial court can better judge the mood and predilections of the jury"); *see Quintero-Cruz v. Ward*, No. CIV.A. 93-2027, 1996 WL 469672, at *43 (W.D. La. Aug. 12, 1996) (upholding state courts' ruling that the judge did not abuse his discretion when two jurors sent notes during the penalty phase that they were coerced into finding the defendant guilty).

The United States Eleventh Circuit Court of Appeals explained the breadth of that discretion in *U.S. v. Dominguez*:

> The most salient aspect of the law in this area is the breadth of discretion given to judges who are called upon to deal with the possibility of juror misconduct.  District court judges deal with jurors on a regular basis, and those judges are in the trenches when problems arise.  The problems that present themselves are seldom clearly defined and a number of variables have to be considered.  There are often no obviously right or wrong answers to the questions that arise.  For all of these reasons, *a trial judge is vested with broad discretion in responding to an allegation of jury misconduct, and that discretion is at its broadest when the allegation involves internal misconduct such as premature deliberations, instead of external misconduct such as exposure to media publicity.*  In a number of decisions we have held that when a jury problem involves the possibility of

> internal misconduct, the trial judge's discretion extends even to
> the initial decision of whether to interrogate the jurors.

226 F.3d 1235, 1246 (11th Cir. 2000) (citations and quotations omitted) (emphasis added);

*see also United States v. York*, 600 F.3d 347, 356-57 (5th Cir. 2010)

While pre-deliberation discussions between jurors have been held to violate the judge's instructions, they do not constitute an impermissible outside influence.  *State v. Weaver*, 917 So.2d 600, 612, 05–169 (La.App. 5 Cir. 11/29/05), writ denied, 944 So .2d 1277, 2006–0695 (La. 12/15/06); *see also Higgins v. Cain*, No. CIV.A. 09-2330, 2011 WL 1399217, at *14 (E.D. La. Feb. 1, 2011), *report and recommendation adopted in part, rejected in part,* No. CIV.A. 09-2330, 2011 WL 1399241 (E.D. La. Apr. 13, 2011), *aff'd,* 720 F.3d 255 (5th Cir. 2013).

Here, Hebert's claim fails for several reasons.  First, as Hebert admits, the trial judge – who had broad discretion to remedy the problem – took corrective action to ensure that there would be no more pre-deliberation communications (to the extent there were any to begin with).  When trial counsel made an objection to suspected communication between the jurors before deliberation, the judge took swift action to remedy the problem:

> Well, we can ask them – this just gives us a new question to ask and I can guarantee you this, this isn't going to happen tomorrow.  Because I'm going to make sure it doesn't happen tomorrow.  I don't know why it happened yesterday.  I've been sitting here for 21 years and that has never happened before where jurors hung around in the hall or outside.  That's never happened before.  I don't know why that happened but I can guarantee you it's not going to happen tomorrow.

St. Rec. Vol. 31 of 45; (*voir dire* transcript, April 17, 2009, p. 35). Given the vast judicial deference afforded a judge who is resolving questions of premature jury deliberations, this

Court cannot say that the state courts' decision to exclude the jurors' testimony was an unreasonable application of federal law.

Next, and perhaps most importantly, none of the pre-deliberation communication contained any outside influence or extraneous prejudicial information. *Resko*, 3 F.3d at 690 ("when there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial") (citations omitted). Taking the affidavits of Hannah Boudreaux and Steven Arceneaux at face value, the jurors talked only among themselves about the evidence presented at trial. Other than the allegation about Nurse Folse (discussed above), there was no claim that any outside influence or extraneous prejudicial information reached the jury prior to its deliberations, and thus no reason to believe the jury based its decision on evidence that was not formally presented at trial.

Finally, Hebert's own proffered affidavits are conflicting as to whether there even was pre-deliberation juror communication at all. Juror Burleigh Johnson said twice that the jurors "didn't really talk about the case".[84] Even assuming the comments alleged by jurors Hannah Boudreaux and Steven Arceneaux were made and heard by another juror, nothing in these comments deprived Hebert of a fair trial. Additionally, nothing in the comments addressed the credibility or truthfulness of the witness.

Both factually and legally, this claim of jury misconduct falls far short of the petitioner's burden of proof on such a claim. Based on the inadequate showing made in

---

[84] State Rec. Vol. 44 of 45, Exh. 18.

connection with this claim, there is no basis for post-conviction relief and this claim should be denied.

### RECOMMENDATION

For the foregoing reasons, **IT IS RECOMMENDED** that Hebert's petition for issuance of a writ of *habeas corpus* under 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).

New Orleans, Louisiana, this _10th_ day of _November_, 2016.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**